# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00242-COA

**WILLIE BROWN AND CAROLYN TALLEY BROWN**                    **APPELLANTS**

**v.**

**BLUE CANE COWART TIPPO WATER ASSOCIATION INC., AND ITS BOARD MEMBERS, JOSEPH WILSON, PRESIDENT, PAMUELA HENDERSON, VICE PRESIDENT, LULA BRADLEY, TREASURER, AND DON DAVIS**                    **APPELLEES**

DATE OF JUDGMENT:            12/18/2017
TRIAL JUDGE:                 HON. CATHERINE FARRIS-CARTER
COURT FROM WHICH APPEALED:   TALLAHATCHIE COUNTY CHANCERY
                             COURT, SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANTS:     AZKI SHAH
ATTORNEY FOR APPELLEES:      MELVIN DAVID MILLER II
NATURE OF THE CASE:          CIVIL - OTHER
DISPOSITION:                 AFFIRMED - 06/04/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., GREENLEE AND McDONALD, JJ.**

**McDONALD J., FOR THE COURT:**

¶1.     This appeal arises from a dispute between Willie and Carolyn Brown (the "Browns") and Blue Cane Cowart Tippo Water Association and its board members ("Blue Cane") concerning termination of the Browns' water services. The Browns filed an action for injunctive relief and damages in the Chancery Court of Tallahatchie County and now appeal the court's final judgment. From our review of the record and relevant case law, we find no error and affirm that final judgment.

1

**FACTS AND PROCEDURAL HISTORY**

¶2.     The Browns own a private well and water system known as the Sharkey-Twilight Well.  At the time of this action, there were seven other households on this system.  The Browns were also connected to a second system, the Blue Cane water system, which services approximately 440 households.  Apparently the Browns were the only persons who were simultaneously connected to both well systems.  The Browns had a backflow prevention device attached to their well to prevent contamination from one system to the other.

¶3.     On March 7, 2017, the Browns received results of bacteria screening done on the Sharkey-Twilight Well by the Mississippi Well Owner Network.  It stated that coliform was present, although no E-coli was found.  On March 11, 2017, the Browns notified those connected to the well, including Blue Cane, of the possible contamination and that they would be shutting down the well for further tests.[1]

¶4.     After receiving the March 11, 2017 notice from the Browns, Blue Cane notified the Board of Health of the potential contamination.  On March 20, 2017, Blue Cane had a letter delivered to the Browns through a deputy sheriff notifying them that it needed access their property to check the backflow prevention device.  It also notified them that they were being disconnected from the public system because of its fiduciary duty owed to the members of

---

[1] On March 16, 2017, the results of more tests done by the Mississippi Well Owner Network were sent to the Browns.  This time, no bacteria was found.  But the Browns never provided Blue Cane with these results and only provided them to the court during mediation in August.

2

Blue Cane to maintain a healthy water supply. That evening the board president, Joe Wilson, and a board director, Pam Henderson, went to the Browns' property with the chemical operator and law enforcement in order to test the water from the Sharkey-Twilight Well and the backflow device. They waited for several hours but were denied access.

¶5.    On March 21, 2017, Blue Cane personnel again were denied access to the Browns' property and were told to contact the Browns' attorney. That same day the Browns wrote to Blue Cane and told it that any attempts to come onto their property would be viewed as trespass. They also provided a copy of their prior year's (May 2016) backflow-passing test result that is required yearly and which had been previously supplied to Blue Cane. But they still failed to inform Blue Cane of the more recent test results showing no contamination.

¶6.    On March 22, 2017, Herman Saulsberry, the chemical operator took samples from several locations in the Blue Cane system—the closest location being three miles from the Browns.

¶7.    On March 23, 2017, the health department issued a no-drink order that was communicated to Blue Cane and Sharkey-Twilight customers through television and radio notices. The health department also required a summary of events and plan of action from Blue Cane, which Blue Cane sent on March 24, 2017.  In that plan, Blue Cane noted that because the Browns had refused access to the property, their continued connection to the public system posed a threat. Blue Cane planned to bypass the Browns' lines, which were located on their private property, to cut the water off at the road.

3

¶8.   That same day, Blue Cane implemented its plan and dug outside the Browns' fence to be able to access the water line and disconnect it.  Apparently, the Browns' attorney arrived and hand-delivered to the workers a letter saying that the Browns were giving them free access to their property to do whatever inspections were needed.[2]   The workers continued to dig where they had been told to access the line and ultimately turn off Blue Cane's water to the property.   The Browns, who still had access to water from their own Sharkey-Twilight Well, apparently shut it down altogether at the recommendation of their attorney.  When and why this was done was not clear.  In any event, any damages to them from lack of access to water were not caused solely by Blue Cane.

¶9.   On the same day as the cut off, the Browns had their backflow device inspected.  Mrs. Brown brought the test results (dated March 24, 2017) to Blue Cane.  But the alleged new valve referenced in those results had the same serial number as the old one, causing Mr. Wilson, the president of Blue Cane, to be suspicious.  Blue Cane continued to press to inspect the system itself.[3]

¶10.   On March 24, 2017, the results of the tests of the Blue Cane system also came back uncontaminated.  Based on these test results, the health department lifted its no-use order.

---

[2] If it existed, this letter was not placed into evidence.  Counsel for the Browns provided this information to the court.

[3] In the meantime, as a result of the disruption in the water supply, a petition circulated among members of Blue Cane that was signed by persons who agreed with the removal of the Browns from membership.  A board member and three other members took the petition to the Blue Cane office.  Approximately 114 people signed the petition.

¶11. Because it could not test the Browns' system and because it could not verify the recent report concerning the maintenance on the backflow device, at a regular meeting of the board of directors on April 4, 2017, Blue Cane voted to terminate the Browns' membership. No written notice was given to the Browns about this meeting. Their service had already been disconnected due to the emergency situation; so the meeting did not deal with their service, just their membership. The Browns were notified that their membership was terminated and presented with a cost bill for the work Blue Cane had done in the amount of $4,316.25.

¶12. On April 5, 2017, the Browns filed a complaint in the Tallahatchie County Chancery Court for wrongful termination of their water services. They also moved for a temporary restraining order (TRO) and a permanent injunction. In their complaint, the Browns sought a reconnection with the Blue Cane system and recovery for costs.

¶13. On April 6, 2017, the court held a TRO hearing with no notice to Blue Cane. At that hearing, the Browns represented to the court that they had given Blue Cane permission to come onto their property to read the meter, that they were current in their payments, and that Blue Cane's board terminated their water service with no notice to them at a meeting on April 4, 2017. No mention was made of the water contamination issues and interaction between the parties prior to the board meeting. Based on the Browns' testimony, the chancery court issued a TRO, ordering Blue Cane to immediately restore the water connection to the Browns.

¶14. On April 10, 2017, the chancery court convened a hearing to determine whether a

permanent injunction should issue. This time Blue Cane was present. Through testimony of Blue Cane's president, Joe Wilson, and the office manager, Brenetta Hoskins, the contamination problem was revealed as well as the actions Blue Cane had to take to insure safe water to its 440 customers. Blue Cane admitted that the Browns did not have notice that their membership would be discussed at the April 4 meeting. But their service had been disconnected before the April 4 meeting because of the contamination notification the Browns had given Blue Cane and because Blue Cane could not go onto the Browns' property to verify proper functioning of the backflow preventer. During the hearing, Blue Cane informed the court that it was willing to reconnect the Browns to the public system under the condition it could get onto the property to do the inspections needed. The Court ordered that Blue Cane immediately inspect the Browns' backflow device (by 5 p.m. that day) and if it passed inspection, then the Browns would be reconnected to the system by 5 p.m. the next day, April 11, 2017. The Browns were ordered to allow safe access to their property or be fined $500 per day. The parties were given 20 days to submit arguments to the court on a division of the costs.

¶15. On April 26, 2017, the Browns filed a motion for contempt against Blue Cane claiming that Blue Cane had not tested the water at their home as the court required. The court held a hearing on this motion on May 31, 2017, at which Blue Cane presented two sets of test results, showing that the water going to the Browns' home had been tested. The court noted that it had not ordered testing at the Brown house itself and that it felt testing the water

6

going to and from the house satisfied the court's mandate. The court was also informed that the backflow device was tested the same day that the meter was moved, and it passed the test. The court denied the Browns' motion, and the parties agreed to attend mediation for any unresolved issues.

¶16. On August 31, 2017, the court conducted the mediation and made a record of various documents that had been provided. Among them were the March 11, 2017 Sharkey-Twilight Well's test results showing contamination and the subsequent March 16, 2017 test results showing no contamination. The Browns had not previously provided these to Blue Cane or to the Court. The Court commented on points in the history of the parties' dispute where it had been possible to resolve the issue had either party taken certain actions. The court asked the parties to provide an affidavit from the deputy sheriff who had served the March 20 letter to the Browns concerning what he told them and whether the Browns responded that Blue Cane could or could not come onto their property. The court also wanted to know from Entergy when the Browns' meter to the Sharkey-Twilight Well was disconnected.

¶17. In October 2017, an affidavit from John Paige, a part-time deputy sheriff, was obtained; he stated that he merely delivered the letter to Mrs. Brown and had no discussion with her about her dealings with Blue Cane. Both parties also submitted documentation to the court about the costs they incurred in this matter.

¶18. On or about December 15, 2017, the chancery court issued its final judgment in the matter. In essence, the court found that the Browns had a test done on the Sharkey Twilight

Well system improperly, which showed contaminants; a later test correctly showed no contaminants. The Browns notified persons on the system about a contamination problem but not about the later test results. The court further found that when Blue Cane sought to test the system, the Browns denied them access to the property. Accordingly, the court held that the Browns owed Blue Cane its expenses, less their own expenses, which resulted in a judgment in favor of Blue Cane in the amount of $3,585.63, which the court ordered to be paid at a rate of $75 per month. The court specifically disallowed Blue Cane's reconnection costs, saying that it was reasonable that the line be moved outside of the Browns' fences to ensure that peace would be maintained between the parties.

¶19. The Browns' motion for new trial under Rule 59 of the Mississippi Rules of Civil Procedure was filed with the clerk on January 3, 2018, although the certificate of service indicates that it was mailed to Blue Cane's attorney on December 27, 2017. In their motion, the Browns argued several of the facts listed above and contended that the court's decision was contrary to the evidence presented. In response, Blue Cane raised other facts and contended that the Browns had failed to raise any valid reason to alter the findings of the court. On January 23, 2018, the chancery court denied the motion for a new trial because the Browns had failed to present any facts, law, or legal theories to support their request for relief. On February 2, 2018, the Browns filed their notice of appeal.

## STANDARD OF REVIEW

¶20. We review a chancery court ruling for abuse of discretion and will not disturb a

chancellor's findings unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. *Gulf Coast Research Lab. v. Amaraneni*, 722 So. 2d 530, 532 (¶8) (Miss. 1998). If supported by substantial credible evidence, we leave a chancellor's factual findings undisturbed. *In re Estate of Flowers*, 264 So. 3d 775, 778 (¶14) (Miss. 2019). Jurisdiction is a question of law, which this court reviews de novo. *Way v. Clark*, 208 So. 3d 9, 11 (¶11) (Miss. Ct. App. 2017).

## DISCUSSION

### I. Whether appellate jurisdiction exists.

¶21. Although the parties do not raise the issue, this Court must first determine that it has jurisdiction to consider this appeal. *Hamilton v. Southwire Co.*, 191 So. 3d 1275, 1279 (¶15) (Miss. Ct. App. 2016); *Gallagher v. City of Waveland*, 182 So. 3d 471, 474 (¶13) (Miss. Ct. App. 2015). After reviewing when the final judgment, the motion for a new trial, and the notice of appeal were filed and recent precedent, we determine that we do have jurisdiction to consider the merits of the issues on appeal. In the past, we had strictly enforced the time limits for filing appeals in cases where post-trial motions are not timely filed. But these rules have been relaxed.

¶22. Mississippi Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with the clerk of the trial court within thirty days after the date of entry of the judgment or order appealed from." M.R.A.P 4(a). Certain post-trial motions will toll this thirty-day deadline, including a motion for a new trial filed under Mississippi Rule

9

of Civil Procedure 59. (The law had once provided that the extension of time to appeal operates only if the post-trial motion itself is timely filed. *Brand v. Barr*, 980 So. 2d 965, 962 (¶¶10-11) (Miss. Ct. App. 2008).) Under Rule 59(e), motions for a new trial must be filed within ten (10) days of the judgment. Moreover, a paper is not "filed" until the clerk actually receives it. *Bolton v. Illinois Cent. R.R. Co.*, 218 So. 3d 311, 313 (¶8) (Miss. Ct. App. 2017). In *Byrd v. Biloxi Regional Medical Center*, 722 So. 2d 166, 168-69 (¶12) (Miss. Ct. App. 1998), we held that "an untimely filed Motion for Reconsideration will not excuse an untimely Notice of Appeal, and clearly will not create or confer jurisdiction in this court."

¶23.    The Mississippi Supreme Court relaxed this strict enforcement in *Wilburn v. Wilburn*, 991 So. 2d 1185 (Miss. 2008). In that case, the chancery court issued its modification order on June 1, 2007. *Wilburn*, 991 So. 2d at 1191 (¶12). Counting weekends, the response was due on June 11, 2007. *Id*. The ex-wife filed a "Motion for Reconsideration" one day later on June 12, 2007. *Id*. The motion was denied and timely appealed. *Id*. at 1190 (¶8). The Mississippi Supreme Court applied established precedent and found that the motion for reconsideration was untimely. But the Court further found that because the husband did not object to the timeliness of the motion when it was before the chancery court, he was procedurally barred from raising the issue for the first time on appeal. *Id*. at 1191 (¶13). The Court proceeded to consider the appeal on its merits. *Id*. at 1192 (¶14).

¶24.    We recently applied *Wilburn* in *Massey v. Oasis Health & Rehab of Yazoo City LLC*, No. 2017-CA-00086-COA, 2018 WL 4204207 (Miss. Ct. App. Sept. 4, 2018). In *Massey*

the circuit court granted a motion to compel arbitration on November 9, 2016. *Id*. at *4 (¶11). Massey filed a motion to alter or amend the judgment under Rule 59 on November 22, 2016—one day late. *Id.* at *5 (¶16). Massey's motion was denied and appealed within thirty days of the denial. *Id.* at (¶17). We reviewed prior cases that dealt with the timeliness of an appeal when a motion for new trial or reconsideration was not timely filed in the court below. *Id.* We noted the Mississippi Supreme Court's ruling in *Wilburn v. Wilburn*, *supra*, which created an exception to the bar of hearing an appeal if the timeliness of a post-trial Rule 59 motion is not challenged before the trial court. *Id.* at *6 (¶18). Following these precedents in *Massey*, we held:

> Here, just as in *Wilburn*, Massey filed his Rule 59 motion one day too late, and Oasis responded to the motion on the merits—without objecting to the motion as untimely. After the circuit court denied Massey's Rule 59 motion, Massey filed a notice of appeal. Just as in *Wilburn*, Massey filed his notice of appeal within thirty days of the order denying his Rule 59 motion, but more than sixty days after entry of the underlying order. As to the issue of appellate jurisdiction, there is no material difference between this case and *Wilburn*. Under *Wilburn*, we have jurisdiction to address the appeal and the merits of the underlying order compelling arbitration.

*Massey*, 2018 WL 4204207, at *6 (¶20). The special concurrence in *Massey* noted a similar holding found in *Carter v. Carter*, 204 So. 3d 747 (Miss. 2016), that the lack of an objection to an untimely Rule 59 motion procedurally bars an appellee from raising the issue of timeliness on appeal. *Massey*, 2018 WL 4204208, at *15 (¶59) (Greenlee, J., specially concurring). The concurrence pointed out that the *Carter* decision cited federal case law, saying:

11

Our supreme court seems to recognize, as the United States Supreme Court did in *Bowles*,[4] that "procedural rules adopted by the Court for the orderly transaction of its business are not jurisdictional and can be relaxed by the Court in the exercise of its discretion . . . ." *Bowles*, 551 U.S. at 212, (quoting *Schacht v. United States*, 398 U.S. 58, 64 (1970)). New Mississippi ground is being broken. . . .

*Massey*, 2018 WL 4204207, at *15 (¶61) (Greenlee, J., specially concurring).

¶25. In this case, the final judgment was signed on December 15, 2017, and filed with the clerk on December 18, 2017. The Browns had ten days to file their motion for a new trial (i.e., December 28, 2017). Browns' counsel indicated in his certificate of service that he served the motion on Blue Cane's counsel by mail on December 27, 2017 (a Thursday). But the clerk did not file the motion until January 3, 2018, which was seven days later and sixteen days after the judgment was filed.

¶26. Blue Cane responded to the motion for a new trial but did not challenge its untimely filing. On January 23, 2018, the chancery court denied the motion for a new trial in an order filed with the clerk on January 26, 2018. A notice of appeal was filed on February 2, 2018. Both *Wilburn* and *Massey* are directly on point. Although the Browns' Rule 59 motion was not timely, Blue Cane did not object. Pursuant to *Massey* and *Wilburn*, we find that we do have jurisdiction to proceed to a ruling on the merits.

## II. Whether the chancery court abused its discretion in denying the Browns' motion for new trial.

¶27. A motion for new trial filed more than ten days after the entry of the judgment falls

---

[4] *Bowles v. Russell*, 551 U.S. 205 (2007)

12

under Rule 60(b). *Woods v. Victory Marketing*, 111 So. 3d 1234, 1236 (¶8) (Miss. Ct. App. 2013). Under Mississippi Rule of Civil Procedure 60(b), the court may relieve a party of the mandates of a final judgment under six enumerated grounds, including a catchall phrase: "any other reason justifying relief." But the motion should be denied where it is merely an attempt to relitigate the issues. *Id.* at 1237 (¶13). Our supreme court has emphasized that Rule 60(b) is for extraordinary circumstances, for matters collateral to the merits. *Davis v. Vance*, 138 So. 3d 961, 964 (¶14) (Miss. Ct. App. 2014).

¶28. Here, the Browns' motion for a new trial was filed more than ten days after the final judgment. In their motion, the Browns offered no new evidence and did not present any evidence that extraordinary circumstances existed. They were merely rearguing the case. The chancery court acted within its discretion in denying the motion, and we find no abuse of that discretion.

### III. Whether the Browns waived their argument of constitutional due process violations.

¶29. On appeal, the Browns argue that their Fourteenth Amendment right to due process was violated when Blue Cane terminated their water service. But from our review of the record, the Browns failed to present this constitutional argument to the chancery court. They argued that they had no notice of the board meeting that terminated their membership; however, Blue Cane made it clear that water services did not depend on membership status. The Browns' water service was disconnected while they were still members. The Browns also argued disingenuously to the chancery court that they had no notice of the disconnect

13

and could get no understanding of why it was done. Under Mississippi common law, there is precedent that addresses utility terminations without notice[5] and the Browns' complaint appears to be brought under those because it simply alleges that the Browns were "wrongfully" disconnected from service. There is no mention of a denial of the constitutional right to due process.

¶30. Issues not raised in the ruling court are waived on appeal. *In re B.A.H.*, 225 So. 3d 1220, 1239 (¶19) (Miss. Ct. App. 2016). The Mississippi Supreme Court has said repeatedly that a ruling court will not be found in error on a matter not presented to it for a decision. *Maness v. K & A Enter. of Miss. LLC*, 250 So. 3d 402, 410 (¶21) (Miss. 2018), *reh'g denied* (Aug. 9, 2018). In this instance, because it was not raised in the ruling court, the Browns' constitutional due process argument is waived.

### IV. Whether the chancery court abused its discretion in its assessment of costs.

¶31. Because the Browns' disconnection was not "wrongful," they had no entitlement to damages, and we find the chancery court did not err in equitably proportioning the costs of the litigation.

¶32. *Tucker v. Hinds County*, 558 So. 2d 869 (Miss. 1990), controls and resolves this case. In *Tucker*, a portion of Tucker's rental property had burned and Tucker had undertaken some repairs. *Id*. at 870. He had obtained a permit from the county which, after several

---

[5] A public service company cannot arbitrarily discontinue service when there is a bona fide dispute over the amount owed. *Burke v. City of Water Valley*, 87 Miss. 732, 40 So. 820, 821 (1906).

inspections over three years, determined Tucker's permit had expired and that he needed

another. *Id*. at 871. There was also an issue with an open electric panel on the outside of the

building. Tucker claimed that when he refused to get another permit, the county instructed

MP&L to disconnect his electric service. *Id.* But MP&L itself inspected the property and

found that a meter base was improperly and hazardously connected and the wiring was done

incorrectly. *Id.* Because of the hazardous and dangerous situation, MP&L disconnected the

power. *Id.* Tucker sued Hinds County and MP&L in circuit court which granted summary

judgment for MP&L and found that Hinds County enjoyed sovereign immunity. *Id.* at 874.

¶33. The Court reviewed the Mississippi Public Service Commission regulations and held

that under these regulations, MP&L had the discretion to act as it did, saying:

> If Tucker was treated unfairly, or was denied due process, it was at the hand
> of Hinds County. MP&L had the right, as a matter of law (indeed it may have
> had the duty), to shut off Tucker's utility service.

*Id*. at 876.[6]

¶34. Our Courts have held that a termination of utility service may be wrongful in limited

instances if done without notice. When there is a bona fide dispute as to what is owed, the

power company may not cut off service. *Mississippi Power Co. v. Cochran*, 178 Miss. 204,

173 So. 287, 289 (Miss. 1937). Water also cannot be withheld from a tenant on the grounds

---

[6] In the *Tucker* case, constitutional due process was raised and the supreme court applied it to the conduct of Hinds County. *Tucker*, 558 So. 2d at 874. But it did not extend any due process requirement to MP&L. This follows clear precedents that denial of due process by a private party, without some form of state action, involves no constitutional violation. *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 939 (1982); *McComb Equip. Co. v. Cooper*, 370 So. 2d 1367, 1368 (Miss. 1979).

that there were unpaid charges against the premises due from a former tenant. *Burke v. City of Water Valley*, 87 Miss. 732, 40 So. 820, 821 (1906). But when a customer failed or refused to pay an undisputed bill, we have held that the power company may discontinue service. *Womack v. Peoples Water Serv. Co.*, 216 Miss. 169, 61 So. 2d 785 (Miss. 1953); *Cent. La. Power Co. v. Thomas*, 145 Miss. 352, 111 So. 142, 143 (Miss. 1927); *Carmichael v. City of Greenville*, 112 Miss. 426, 73 So. 278, 279 (Miss. 1916). Obviously, in *Tucker v. Hinds County*, *supra*, 558 So. 2d at 876, the supreme court held that it was also not wrongful for a utility provider to disconnect service when faced with unsafe or dangerous conditions.

¶35.　In the case at hand, Blue Cane acted as did MP&L in *Tucker*. Blue Cane had been notified by the Browns of potential contamination of the water system. It immediately acted to protect the other 440 users by notifying the Health Department which issued a no-use notice. Blue Cane was required by the Board of Health to develop and implement a plan for containing and eliminating the contamination which Blue Cane did on March 24, 2017. As of that date Blue Cane had no further information on the possible contaminate. Because the Browns were not allowing access to their property, Blue Cane determined that their continued connection to the system posed a threat to all. Blue Cane, like MP&L in *Tucker*, had no choice but to terminate service to the Browns. Later in the litigation, it was learned that the Browns already knew from retesting done on March 17 that there was no contamination but failed to inform Blue Cane of this which would have totally changed the course of subsequent events and eliminated costs to either side.

16

¶36. The Browns want the Court to ignore their failure to tell Blue Cane of the passing contamination results but blame Blue Cane for refusing to accept the tests of their backflow prevention system that they had serviced. However, Blue Cane, which has the duty under law to exercise reasonable care when providing service to customers, *Hopkins v. Miss. Valley Gas Co.*, 866 So. 2d 514, 517 (¶¶13-14) (Miss. Ct. App. 2004), cannot be faulted for not simply accepting the inspection report presented by the Browns, especially when the report appeared suspicious. Blue Cane acted reasonably in insisting to inspect the unit itself prior to reconnecting service. As the supreme court held in *Womack v. People's Water Serv. Co.*, 61 So. 2d 785, 789 (Miss. 1953), an appellant did not show a right to recover damages from the mere fact that the dispute, so far as he was concerned, was bona fide. A party in error is not saved the cost and consequence of his error by a show of good faith. *Id.* A plaintiff must show a reasonable grounds for his actions and when the record does not show that, then he is not entitled to damages. *Id*.

¶37. Technically, the chancery court allowed both sides their expenses in this case. In the end, those of Blue Cane were greater than the Browns'. As the supreme court stated in *In re Estate of Flowers*, 264 So. 3d 775 (Miss. 2019):

> Chancellors have long been vested with discretionary authority to decide matters of equity. Article 6, section 159, of the Mississippi Constitution confers on chancery courts jurisdiction of "All matters in equity . . . ," as well as other enumerated matters. "A court of equity is a court of conscience. The function of the chancellor is, upon equitable considerations, to winnow the wheat from the straw, and his decree will not be set aside on appeal unless, as is not the case here, it is made to appear that it is not equitable but inequitable to let it stand." *Durkin v. Lovknit Mfg. Co.*, 208 F.2d 665, 667 (5th Cir. 1953).

17

*Id*. at 779 (¶16). Here we find that the chancery court winnowed well and equitably divided the costs of the litigation between the parties.

## CONCLUSION

¶38. For the above reasons, the chancery court's final judgment and final decree denying the Browns' motion for new trial is hereby affirmed.

¶39. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., NOT PARTICIPATING.**